IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JERUSHA WILLIAMS, | ) | CASE NO. 1:21-CV-00096-PAB |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Jerusha Williams ("Williams") seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated 09/02/2022). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

On March 12, 2018, Williams filed applications for DIB and SSI, alleging a disability onset date of November 27, 2017. (*See* ECF Doc. No. 13, Exhibits 2D and 3D, PageID # 298-305; ECF Doc. No. 13, Exhibit 3A, PageID # 168). Williams alleged that she is disabled as a result of her bilateral knee osteoarthritis and major depressive disorder, among other impairments. (*See* ECF Doc. No. 13, PageID # 92). The applications were denied initially and upon reconsideration, and Williams requested a hearing before an administrative law judge ("ALJ"). (ECF Doc. No. 13, Exhibit 3B, PageID # 200; *id.* at Exhibit 4B, PageID # 207; *id.* at Exhibit 12B, PageID # 231). On

October 28, 2019, an ALJ held a hearing during which Williams, represented by counsel, and an impartial vocational expert testified. (*Id.* at PageID # 111-139). On January 15, 2020, the ALJ issued a written decision finding that Williams is not disabled. (*Id.* at PageID # 86-104). The ALJ's decision became final on November 23, 2020, when the Appeals Council declined further review. (*Id.* at PageID # 78-80).

On January 14, 2021, Williams filed her Complaint to challenge the Commissioner's final decision. (ECF Doc. No. 1). The parties completed briefing, and on May 2, 2022, then-Magistrate William H. Baughman, Jr. held oral arguments.  (ECF Doc. Nos. 16, 19, 20, and 22). Williams asserts the following assignments of error:

(1) SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE ADMINISTRATIVE LAW JUDGE'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT OF AN ABILITY TO PERFORM LIGHT WORK.

(2) SUBSTANTIAL EVIDENCE SUPPORTS A FINDING THAT THE PLAINTIFF'S MENTAL HEALTH CONDITION WAS A SEVERE IMPAIRMENT.

(ECF Doc. No. 16, PageID # 728, 731).

## III.  BACKGROUND

### A.  Personal, Educational, and Vocational Experience

Williams was born on January 14, 1966, and she was 51 years old on the alleged onset date. (ECF Doc. No. 13, PageID # 115). Williams is married, but she has been separated from her husband since 2010. (ECF Doc. No. 13, Exhibit 1F, PageID # 398). Williams has a boyfriend and lives with her brother. (*Id.*; ECF Doc. No. 13, PageID # 125). Williams has two adult children and one grandson, whom Williams babysits on a regular basis. (ECF Doc. No. 13, Exhibit 1F, PageID # 398).

Williams went to college for four years and studied early childhood development. (ECF Doc. No. 13, PageID # 115). Williams's past work experience includes jobs as a nurse assistant,

STNA, railroad contractor (*i.e.*, a van driver), and a toddler teacher. (ECF Doc. No. 13, Exhibit 3E, PageID # 334). Up until March 20, 2018, Williams worked "every day" as a toddler teacher at Michelle's Learning Center. (ECF Doc. No. 13, PageID # 117). Williams stopped working at Michelle's Learning Center because she was experiencing knee pain, and she was "barely able to walk." (*Id.*).

### B.    Relevant Hearing Testimony

#### 1.    *Williams's Testimony*

Williams testified that she is unable to work because she cannot sit or stand for a long enough time due to pain and stiffness in her right knee, and that she sometimes uses a cane for mobility. (ECF Doc. No. 13, PageID # 122-23, 125). Williams also testified that she has recently been diagnosed with cubital tunnel in her elbow, and that her hands are sometimes weak or numb. (*Id.* at PageID # 122).

Williams testified that she has a history of asthma and depression, and that she recently started counseling for the latter. (*Id.* at PageID # 128). Williams testified that she self-isolates, has crying spells, feels fatigued, and prefers not to leave the house. (*Id.* at PageID # 129-30). Williams does, however, attend church, participates in a book club, babysits her grandson, and occasionally takes her grandson places, such as the zoo. (*Id.* at PageID # 130-32). Williams also frequently reads, plays crossword puzzles, and watches movies. (*Id.* at PageID # 130).

Williams testified that she can perform basic housework, including vacuuming and doing laundry. (*Id.* at PageID # 124). She testified, however, that these tasks take her longer because they cause stress on her knee, which requires her to take breaks to rest. (*Id.*). Williams testified that she can stay on her feet for about one hour, and then she needs to rest for about thirty minutes before she can be on her feet again. (*Id.* at PageID # 124-25).

In her decision, the ALJ summarized some of Williams's hearing testimony as follows:

The claimant alleged that she was unable to perform work due to the limiting signs and symptoms associated with her impairments. She reported that she experienced stiffness with sitting or standing too long, and described nerve pain in her knee as well as weakness in her hands. She explained that she continued to experience muscle spasms and a lot of pain with her right knee, [and] described problems with going up and down steps. The claimant testified that she experienced numbness and tingling in her fingers and arms, and noted she had no strength in her hands such that she was unable to hold onto things. She noted that she experienced a bad asthma attack the week prior, necessitating emergency department treatment. Further, she described limitations with lifting, squatting, bending, walking, and kneeling (5E).

(*Id.* at PageID # 96).

### 2. *Vocational Expert's Testimony*

The ALJ asked the VE several hypothetical questions. First, the ALJ asked the VE to:

assume a hypothetical individual [with] the claimant's age, education and work experience who is able to perform light exertional work activities with the following limitations. The individual should never use foot controls on the left. Can frequently stoop. Occasional[ly] climb ramps and stairs, kneel and crouch. Should never climb ladders, ropes, and scaffolds or crawl. Should avoid concentrated exposure to dust, odors, fumes and pulmonary irritants. Could that hypothetical individual perform any of the past jobs as actually performed or generally performed in the national economy?

(*Id.* at PageID # 135). The VE responded: "[o]nly as classified, the toddler teacher, but not as performed in this case." (*Id.*).

Next, the ALJ asked the VE whether the hypothetical individual could perform any other work, and to provide a few examples. (*Id.*). The VE identified unskilled jobs, such as a cashier, a food service worker, and a sales attendant. (*Id.* at PageID # 135-36). The ALJ then asked if those jobs would remain if: (1) "the individual should not use foot controls on the right either and could frequently handle and finger on the right . . . "; and (2) "the individual can only occasionally stoop but should never kneel on the left or right . . . . " (*Id.* at PageID # 136). The VE responded affirmatively. (*Id.*). The ALJ then asked the VE whether the hypothetical individual could perform the identified jobs if that person needed a cane to walk and balance. (*Id.*). The VE responded that the hypothetical individual could not, and that the use of a cane to walk and balance would reduce

the hypothetical individual to sedentary work. (*Id.* at PageID # 136-37).

### C.    Relevant Medical Evidence

The discussion of the medical evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs and/or deemed relevant by the undersigned. Because the primary focus of Williams's Brief on the Merits is her bilateral knee osteoarthrosis and her depressive disorder, the discussion is limited accordingly. (*See* ECF Doc. No. 16).

#### 1.    *Jason Chao, M.D.: November 28, 2017*

Williams presented to Dr. Chao, her primary care physician, on November 28, 2017, for a knee surgery referral and a renewal of her depression medication. (ECF Doc. No. 13, Exhibit 2F, PageID # 405). Dr. Chao noted that Williams was obese, and she had diagnoses of hypertension, joint pain (knee), and depression. (*Id.* at PageID # 408). Dr. Chao referred Williams to Brian Victoroff, M.D., for her knee pain, and advised Williams to continue working on her diet and exercise for weight loss. (*Id.* at PageID # 409).

#### 2.    *Brian Victoroff, M.D.: November 29, 2017*

Williams presented to Dr. Victoroff, an orthopedic surgeon, on November 29, 2017, for left knee pain. (ECF Doc. No. 13, Exhibit 4F, PageID # 444). Williams reported that she was experiencing consistent pain, was having difficulty negotiating stairs, that she had to stop working, that Meloxicam and previous cortisone injections were not helpful, and that she was considering surgery. (*Id.*). On physical examination, Dr. Victoroff noted that Williams walked with a somewhat antalgic gait, had a well-preserved range of motion, and had tenderness diffusely about the knee, primarily along the medial joint. (*Id.* at PageID # 446). Dr. Victoroff diagnosed Williams with osteoarthritis of the left knee, and referred her to Christopher Bechtel, M.D., for further discussion of treatment options. (*Id.*).

5

### 3. Christopher Bechtel, M.D.: January 10, 2018

Williams presented to Dr. Bechtel on January 10, 2018, for left knee pain. (ECF Doc. No. 13, Exhibit 4F, PageID # 448). Williams reported that she had been experiencing bilateral knee pain for three years, and that the pain was worse with activity and prolonged periods of sitting or standing. (*Id.*). On physical examination, Dr. Bechtel indicated that Williams had a pleasant mood and affect, and a BMI of 47. (*Id.* at PageID # 450-51). Dr. Bechtel indicated that Williams had moderate to severe osteoarthritis in both knees, mild varus deformity, and the majority of her degenerative changes in the medial and patellofemoral component. (*Id.* at PageID # 451). Dr. Bechtel indicated that Williams's weight was likely contributing to her symptoms, and that – if Williams lost weight and was still experiencing severe pain with no relief from conservative treatment – they could consider a total knee replacement. (*Id.* at PageID # 451-52). Dr. Bechtel, therefore, recommended delaying any surgery until "absolutely necessary." (*Id.* at PageID # 451). An x-ray of the left knee from January 10, 2018, revealed mild tricompartmental degenerative change. (*Id.* at PageID # 435).

### 4. Latonya Fore, APRN-CNP: January 30, 2018 – March 20, 2018

Williams presented to Nurse Fore on January 30, 2018, for a bariatric surgery consultation (ECF Doc. 13, Exhibit 4F, PageID # 456). At the time, Williams weighed 230 pounds and had a BMI of 42. (*Id.* at PageID # 456, 461). On physical examination, Nurse Fore noted that Williams had a normal mood and affect. (*Id.* at PageID # 459). Nurse Fore recommended that Williams eat more protein and vegetables instead of bread, and that Williams exercise for thirty minutes per day, five days per week. (*Id.* at PageID # 460).

Williams presented for a follow-up appointment with Nurse Fore on February 27, 2018, by which point Williams had lost fourteen pounds. (*Id.* at PageID # 462). On physical examination, Nurse Fore again noted that Williams had a normal mood and affect. (*Id.* at PageID # 464).

Williams presented for another follow-up appointment on March 20, 2018, by which point Williams had lost a total of nineteen pounds. (*Id.* at PageID # 476).

### 5.    *Melinda Lawrence, M.D.: March 15, 2018*

Williams presented to Dr. Lawrence on March 15, 2018, with a chief complaint of bilateral knee pain. (ECF Doc. No. 13, Exhibit 4F, PageID # 467). Williams reported that her pain was constant, and that it was worse when walking or applying pressure. (*Id.*). Williams reported that she had tried multiple therapies in the past, and that she was currently taking Vicodin, which "takes the edge off of the pain." (*Id.*).

On physical examination, Dr. Lawrence noted a normal range of motion of the knees, but pain with movement. (*Id.* at PageID # 469). Dr. Lawrence also noted that Williams had an antalgic gait, crepitus of both knees, and a normal mood and affect. (*Id.*). Dr. Lawrence diagnosed Williams with osteoarthritis of the right knee. (*Id.* at PageID # 470).

### 6.    *Brian Victoroff, M.D.: March 16, 2018*

On March 16, 2018, Williams presented to Dr. Victoroff with a chief complaint of right knee pain. (ECF Doc. No. 13, Exhibit 3F, PageID # 423). Williams reported that she recently received treatment in the emergency room related to a fall, and that she was advised to follow-up with orthopedic surgery. (*Id.*). Williams reported a history of osteoporosis in both knees, that she had seen Dr. Bechtel, and that she was trying to reduce her weight in order to be a candidate for arthroplasty surgery. *(Id.*).

Dr. Victoroff indicated that he reviewed the x-rays from the emergency room related to Williams's fall, and that they showed a slight narrowing of the medial joint space, but otherwise no fracture dislocation or subluxation. (*Id.* at PageID # 425). Dr. Victoroff diagnosed Williams with mild osteoarthritis of the right knee, and determined that surgical intervention was not necessary at that time. (*Id.*).

### 7.    *Christopher Bechtel, M.D.: March 21, 2018 – October 24, 2018*

Williams presented to Dr. Bechtel for a follow-up appointment on March 21, 2018, to discuss a plan of care for her left knee. (ECF Doc. No. 13, Exhibit 6F, PageID # 505). Dr. Bechtel indicated that Williams had lost twenty-five pounds, but continued to experience significant pain in her left knee. (*Id.*). Williams reported experiencing a severely diminished quality of life, and having difficulty performing activities of daily living, such as going up and down stairs, bending, and putting on her socks and shoes. (*Id.*). Williams reported that her left knee pain was getting worse, and that she recently fell on her right knee because of the pain in her left knee. (*Id.*).

On physical examination, Dr. Bechtel noted that Williams had: (1) a pleasant mood and affect; (2) range of motion from 0-110 degrees with crepitus bilaterally; (3) tenderness over the patella; (4) pain with patellar grind test; (5) stable to varus/valgus/anterior/posterior stress throughout the range of motion; (6) subtle varus deformity bilaterally (which Dr. Bechtel was "able to correct to neutral"); (7) predominantly medial joint line tenderness to palpation; and (8) mild effusion bilaterally, among other notations. (*Id.* at PageID # 508). Dr. Bechtel diagnosed Williams with primary osteoarthritis of the left knee, and osteoarthritis of the right knee. (*Id.*).

On April 23, 2018, Dr. Bechtel performed a left knee medial unicompartmental arthroplasty on Williams. (ECF Doc. No. 13, Exhibit 4F, PageID # 428). Williams presented to Dr. Bechtel on June 27, 2018, for a post-operation follow-up appointment wherein she reported doing very well, being "very pleased" with the results, having minimal pain, and using narcotic pain medication very sparingly. (ECF Doc. No. 13, Exhibit 9F, PageID # 528).

On July 13, 2018, Williams presented to Dr. Bechtel for another post-operation follow-up appointment. (ECF Doc. No. 13, Exhibit 9F, PageID # 524). Williams reported that she was doing very well, that she was no longer taking narcotics for pain management, that she was happy with her results, and that she was able to return to all of her normal day-to-day activities. (*Id.*). Dr.

8

Bechtel indicated that Williams had no restrictions related to her left knee, and that Williams should continue all of her recreational and day-to-day activities. (*Id.*).

On October 24, 2018, Williams presented to Dr. Bechtel for another post-operation follow-up appointment. (ECF Doc. No. 13, Exhibit 9F, PageID # 520). Williams reported that she was doing "significantly better[,]" and that she was not using any assistive devices. (*Id.*).

### 8.      Paul G. Josell, Psy.D.: Psychological Report Dated August 29, 2018

Paul G. Josell, Psy.D. performed a psychological evaluation on Williams on behalf of the state agency on August 29, 2018. (ECF Doc. No. 13, Exhibit 1F, PageID # 398-401). After reviewing Williams's background information, education and work history, healthy history, daily activities, and mental status (wherein he noted that Williams did not exhibit acute signs of depression during the examination), Dr. Josell indicated a DSM-5 diagnostic impression of: "Persistent Depressive Disorder, [w]ith intermittent major depressive episodes, without current episode, Moderate[.]" among others. (*Id.* at PageID # 401).

In his report, Dr. Josell noted that Williams struggled with tasks involving numbers, became mildly tearful at one point, but was generally pleasant and cooperative. (*Id.* at PageID # 399). Dr. Josell opined that Williams: (1) appears to have an impaired mental ability to relate to others to the extent Williams reported being disinterested in interacting with others, although she gets along with her brother and boyfriend, babysits her grandson, talks with a friend on the phone, and appropriately interacted with Dr. Josell during the interview; (2) does not appear to have an impaired mental ability to understand and follow directions; (3) appears to have a generally adequate mental ability to maintain attention, concentration, persistence, and pace to perform routine tasks; and (4) does not appear to have an impaired mental ability to withstand the stress and pressures associated with day-to-day work activity. (*Id.* at PageID # 401).

### 9.    Jason Chao, M.D.: March 26, 2019

Williams presented to Dr. Chao on March 26, 2019, for a medication follow-up appointment. (ECF No. No. 13, Exhibit 14F, PageID # 624). Williams reported feeling depressed with minimal relief from Venlafaxine, and that she planned to see a psychologist in April. (*Id.* at PageID # 625). On physical examination, Dr. Chao indicated that Williams's mood and affect were normal, and that her judgment and insight were intact. (*Id.* at PageID # 627). Dr. Chao also indicated that Williams "does not need assistance with sitting, standing or walking[,]" and that Williams "is not using an assistive device." (*Id.* at PageID # 625).

### 10.    Christopher Bechtel, M.D.: March 26, 2019

Williams also presented to Dr. Bechtel on March 26, 2019. (ECF Doc. No. 13, Exhibit 17F, PageID # 682). Williams reported that her left knee was doing well post-surgery, but that she had been suffering from chronic right knee pain for the past few years. Williams reported experiencing a diminished quality of life, and difficulty performing day-to-day activities. (*Id.*). Dr. Bechtel noted that Williams's mood and affect were normal, and that he discussed the risks, benefits, and alternatives to surgery with Williams related to her right knee. (*Id.*). Dr. Bechtel indicated that he thought Williams would be a good candidate for a medial unicompartmental knee replacement, similar to the surgery Williams had on her left knee. (*Id.* at PageID # 683). Dr. Bechtel ultimately diagnosed Williams with osteoarthritis of the right knee. (*Id.* at PageID # 685).

### 11.    Deborah Klecha, LPCC: April 13, 2019

Williams presented to Deborah Klecha, LPCC, on April 13, 2019, with a chief complaint of feeling "overwhelmed a lot[,]" and a goal of being "able to function and be around people[.]" (ECF Doc. No. 13, Exhibit 12F, PageID # 571). Williams reported that her depression medications were not working, that she tends to isolate, and that she does not want to be around people. (*Id.*). Ms. Klecha noted that Williams had a depressed mood, and that Williams's affect was congruent

10

with her mood. (*Id.* at PageID # 591). Ms. Klecha indicated that Williams appeared to struggle with significant depressive symptoms, and that Williams would benefit from a psychological evaluation. (*Id.* at PageID # 593). Ms. Klecha diagnosed Williams with major depressive disorder recurrent moderate, and recommended cognitive behavioral treatment and supportive therapy. (*Id.* at PageID # 594, 597).

### 12. *Christopher Bechtel, M.D.: April 22, 2019 & May 8, 2019*

Dr. Bechtel performed a right unicompartmental knee arthroplasty on Williams on April 22, 2019. (ECF Doc. No. 13, Exhibit 13F, PageID # 619). Williams presented to Dr. Bechtel on May 8, 2019, for a post-operation follow-up appointment wherein she reported doing very well and progressing with physical therapy. (ECF Doc. No. 13, Exhibit 17F, PageID # 678).

### 13. *Deborah Klecha, LPCC: May 11, 2019 & May 25, 2019*

Williams presented to Ms. Klecha on May 11, 2019, for a therapy follow-up appointment. (ECF Doc. No. 13, Exhibit 12F, PageID # 598). Ms. Klecha again noted that Williams had a depressed mood, and that Williams's affect was congruent with her mood. (*Id.* at PageID # 604). Williams reported that she was recovering from surgery, that she continued to be depressed, and that her grandson motivates her to get out of bed. (*Id.* at PageID # 606).

Williams presented to Ms. Klecha on May 25, 2019, for another therapy follow-up appointment. (ECF Doc. No. 13, Exhibit 16F, PageID # 637). Williams reported that she did not "want people to feel sorry" for her, that she was frustrated with her knee issues, and that she was still processing her mother's death. (*Id.* at PageID # 637-38). Williams also reported that she was trying to get out of the house more often with the encouragement of her family. (*Id.* at PageID # 638). Ms. Klecha indicated that she and Williams discussed the benefits of psychotropic medication, and that Williams was going to try to "do one thing for herself each day." (*Id.* at PageID # 647).

### 14.     Christopher Bechtel, M.D.: June 19, 2019

Williams presented to Dr. Bechtel on June 19, 2019, for another post-operation follow-up. (ECF Doc. No. 13, Exhibit 17F, PageID # 674). Williams reported doing "quite well" overall, with some occasional aches and pains. (*Id.*). Williams reported that she was "significantly better than what she was prior to surgery[,]" and that she was happy with the results. (*Id.*). Dr. Bechtel noted that Williams's mood and affect were normal, and that Williams should continue with outpatient physical therapy. (*Id.* at PageID # 674).

### 15.     Deborah Klecha, LPCC: July 20, 2019 & August 3, 2019

Williams presented to Ms. Klecha on July 20, 2019, for another therapy follow-up appointment. (ECF Doc. No. 13, Exhibit 16F, PageID # 655). Williams reported having anxiety about visiting her son, who was currently incarcerated. (*Id.* at PageID # 656). Williams's objective during that appointment was to "process thoughts and feelings about visiting her son[.]" (*Id.* at PageID # 656).

Williams presented to Ms. Klecha on August 3, 2019, for another therapy follow-up appointment. (ECF Doc. No. 13, Exhibit 16F, PageID # 664). Williams's objective was to process her mother's death, including feelings of grief and guilt. (*Id.* at PageID # 665).

### 16.     Jason Chao, M.D.: August 20, 2019

Williams presented to Dr. Chao on August 20, 2019, for a medication follow-up appointment. (ECF Doc. No. 13, Exhibit 18F, PageID # 687). Williams reported seeing a counselor twice per month for depression, and using a cane for assistance with ambulation. (*Id.*). That same day, Dr. Chao completed a questionnaire from Williams's counsel wherein he opined that Williams would miss about three days of work per month related to her "arthritis of knees, elbows." (ECF Doc. No. 13, Exhibit 15F, PageID # 633).

12

### 17.    *Christopher Bechtel, M.D.: September 4, 2019*

Williams presented to Dr. Bechtel on September 4, 2019, for another post-operation follow-up. (ECF Doc. No. 13, Exhibit 19F, PageID # 693). Williams reported that she was still experiencing some occasional tightness and stiffness in her right knee, but was doing better than she was before surgery. (*Id.*). Williams reported that she was not taking pain medication, and that she was not using any assistive device. (*Id.*). Williams also reported that she had some hypersensitivity over her right knee, as well as some burning pain over the incision. (*Id.*). Dr. Bechtel noted that Williams had a normal mood and affect, and that he thought some of Williams's pain was neuropathic. (*Id.*).

### D.    State Agency Reports

### 1.    *Mental Impairments: Report Dated September 5, 2018*

Kristen Haskins, Psy.D. reviewed Williams's file on behalf of the state agency on September 5, 2018, related to Williams's mental impairments. (*See* ECF Doc. No. 13, Exhibit 1A, PageID # 147). Dr. Haskins determined that Williams's depression is not a severe impairment, and that Williams had no more than mild limitations in the area of mental functioning. (*Id.* at PageID 146, 160). Aracelis Rivera, PsyD., also concluded that Williams's depression is not a severe impairment on December 19, 2018. (*Id.* at Exhibit 5A,  PageID # 176).

### 2.    *Physical Impairments: Report Dated August 3, 2018*

William Bolz, M.D. reviewed Williams's file on behalf of the state agency on August 3, 2018, related to Williams's physical impairments. (ECF Doc. No. 13, Exhibit 2A, PageID # 154-167). Dr. Bolz opined, in part, that Williams could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for about six hours in an eight-hour workday; (4) sit for about six hours in an eight-hour workday; (5) occasionally climb ramps and stairs; (6) never climb ladders, ropes, or scaffolds; (6) frequently stoop; (7) occasionally

13

kneel and crouch; and (8) never crawl. (*Id.* at PageID # 162-63). Dr. Bolz also opined that Williams

had unlimited balance. (*Id.* at PageID # 163). Mehr Siddiqui, M.D., agreed with these limitations

on December 19, 2018. (ECF Doc. No. 13, Exhibit 5A, PageID # 180).

## IV.    THE ALJ'S DECISION

The ALJ made the following conclusions:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.    The claimant has not engaged in substantial gainful activity since November 27, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: osteoarthritis of the right knee status post arthroplasty, osteoarthritis of the left knee status post arthroplasty, ulnar neuropathy of the right upper extremity, asthma, and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that for the period between November 27, 2017 and April 7, 2019, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except should never use foot controls on the left; can frequently stoop; occasionally climb ramps and stairs, kneel, and crouch; should never climb ladders, ropes, and scaffolds or crawl; should avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants. As of April 8, 2019, she additionally should not use foot controls on the right; and should frequently handle and finger on the right.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on January 14, 1966 and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 27, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF Doc. No. 13, PageID # 91-104).

## V.   LAW & ANALYSIS

### A.   Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip* at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the

15

regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original).

**B.    Standard for Disability**

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability, and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[1]

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) (regarding DIB) and 416.920(a)(4), (b)-(g) (regarding SSI); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.   Analysis

Williams raises two issues for judicial review. First, Williams argues that the ALJ's RFC assessment is not supported by substantial evidence because the evidence does not support a finding that she can perform light work. (ECF Doc. No. 16, PageID # 728). Second, Williams argues that the ALJ erred by determining that her major depressive disorder is not a severe impairment. (*Id.* at PageID # 731).

### 1.   *Whether the ALJ's RFC Assessment is Supported by Substantial Evidence*

As previously noted, Williams argues that the ALJ's RFC assessment finding that she can perform light work is not supported by substantial evidence. (ECF Doc. No. 16, PageID # 728). More specifically, she argues that "the ALJ erred in failing to include further limitations in [her] ability to stand and walk due to osteoarthritis in [her] knees." (*Id.*). For the following reasons, I conclude that Williams's argument lacks merit.

### i.     *RFC Assessment: 20 C.F.R. §§ 404.1545 and 416.945*

Prior to determining whether a claimant can perform her past relevant work at Step Four, an ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity."); 20 C.F.R. § 404.1520(e) ("[W]e will assess and make a finding about your [RFC] based on all the relevant medical and other evidence in your case record[.]"); 20 C.F.R. § 416.945. An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. §§ 404.1545(a)(1) and 416.945(a)(1).

On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)[.]" C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).

Medical source opinions are evaluated using the factors listed in 20 C.F.R. § 404.1520c(c). The factors include: (1) supportability; (2) consistency; (3) the source's relationship with the claimant; (4) the source's specialized area of practice, if any; and (5) "other factors that tend to support or contradict a medical opinion[.]" 20 C.F.R. § 404.1520c(c); 20 C.F.R. § 404.1520c(b)(2) ("The factors of supportability . . . and consistency . . . are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions . . . .").

### ii.      *Light Work: 20 C.F.R. §§ 404.1567(b) and 416.967(b)*

"Light work" is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b) and 416.967(b).

### iii.      *The ALJ's Analysis*

As previously noted, the ALJ determined that Williams's bilateral knee osteoarthritis is a severe impairment, but that it does not meet or equal the severity of one of the listed impairments. (ECF Doc. No. 13, PageID # 92, 95). Having determined that Williams's impairments did not meet or equal the severity of one of the listed impairments, the ALJ then conducted an RFC assessment. (*Id.* at PageID # 95-102).

In the RFC assessment, the ALJ explained that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." (*Id.* at PageID # 96). The ALJ also explained that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c." (*Id.*). The ALJ further explained that, in considering Williams's symptoms, she was required to "follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms." (*Id.*). If shown, the ALJ explained that she then "must evaluate the intensity, persistence, and limiting effects of

the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities." (*Id.*).

In applying this two-step process, the ALJ determined that Williams's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Williams's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . . " (*Id.*). The ALJ then cited and analyzed the records upon which she relied in making this determination, including records from Drs. Chao, Victoroff, and Bechtel, among others, as well as the conclusions of the state agency medical consultants. (*Id.* at PageID # 96-101).

Regarding Williams's statements about the intensity, persistence, and limiting effects of her symptoms, the ALJ determined that Williams's statements were "inconsistent because the level of limitation alleged is not altogether supported by the objective findings." (*Id.* at PageID # 100). The ALJ explained, in part:

> The claimant consistently exhibited 5/5 strength in her bilateral lower extremities, and findings of diminished right upper extremity strength are not consistent in the record (6F/3-9, 6F/10-15, 9F/2-9, 9F/10-12, 10F/8-12, 17F/2-5, 17F/6-9, 17F/10-13). She reported improvement in her pain and functioning subsequent to her knee surgeries, and imaging revealed no evidence of hardware loosening or improper positioning (6F/3-9, 9F/2-9, 9F/10-12, 17F/2-5, 17F/6-9, 19F/2-6). The record contains no evidence of a prescription for an assistive device, and findings of use of a cane are not consistent in the record (see SSR 96-9p; 17F/2-5, 19F/2-6). In fact, by September 2019, she reported that she used no assistive device for ambulation and used no medication for pain management (19F/2-6).

(*Id.* at PageID # 100-01). The ALJ explained that functional limitations are warranted, and explained those limitations as follows:

> To account for her bilateral knee degeneration that was greater in the left knee than the right as of the alleged onset date, she should stand/walk no more than six hours in an eight-hour workday, and never use foot controls on the left. Due to her reported symptoms of tingling and numbness in her hands, she should lift/carry no more than 20 pounds occasionally and 10 pounds frequently. To avoid exacerbating her knee pain and to account for loss of knee range of motion as well as the effects of her obese body habitus on her maneuverability, she should only frequently stoop,

occasionally climb ramps and stairs, only occasionally kneel and crouch, and never climb ladders, ropes, or scaffolds or crawl. To avoid exacerbating her symptoms of asthma, she should avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants. Further, to account for the later worsening in the signs and symptoms associated with her right lower extremity, to include worsening knee degeneration and loss of sensation, she should not use foot controls on the right as of April 7, 2019. Additionally, as of this time, she should only frequently handle and finger on the right due to later findings of sensation loss and intrinsic muscle weakness with finger abduction in the right upper extremity.

(*Id.* at PageID # 101). Regarding the opinions of the state agency medical consultants, the ALJ

explained:

The State agency medical consultants, William Bolz, MD and Mehr Siddiqui, MD, opined that the claimant retained the ability to perform work at the light exertional level with no use of left foot controls, no concentrated exposure to fumes, dusts, gases, or poor ventilation, and postural limitations consistent with those included in the residual functional capacity above (1A, 2A, 5A, 6A). These opinions are somewhat persuasive. Such a finding is supported by findings of left greater than right knee degeneration necessitating arthroplasty, with associated loss of range of motion and related pain (3F/7-9, 6F/10-15, 9F/2-9, 17F/10-13). It also is consistent with her obese body habitus and the need for medication management of her asthma (2F/3-8, 4F/31, 10F/3-7, 11F/17, 14F/2-7). However, they did not have the opportunity to evaluate later evidence. Accordingly, as of April 8, 2019, objective findings of worsening right knee degeneration followed by right knee arthroplasty, loss of right lower extremity sensation, as well as loss of right upper extremity sensation and strength loss support the additional limitations of no use of right foot controls and no more than frequent handling and fingering on the right. Nonetheless, greater limitations are not consistent with findings that include no loss of strength in the bilateral lower extremities, inconsistent finding of right upper extremity loss of strength, no evidence of consistent need or a prescription for an assistive device, and improvement in her symptoms and functioning with treatment (6F/3-9, 6F/10-15, 9F/2-9, 9F/10-12, 10F/8-12, 17F/2- 5, 17F/6-9, 17F/10-13). For these reasons, the assessment of Dr. Chao with regard to time off-task and anticipated missed days of work is not persuasive as it is not consistent with these findings. Further, he provided no articulation of the reasoning behind the level of limitation assessed, to include supporting clinical/imaging findings.

The undersigned also takes note that Dr. Chao provided the claimant with access to a handicap placard. However, the criteria for this finding is unrelated to that for this Agency's disability finding. Accordingly, the undersigned is not required to provide an articulation about evidence that is inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c).

(*Id.* at PageID # 101-02). The ALJ concluded that "these findings are supported by the objective

record and reports of the claimant's daily activities[,]" and that Williams "retained the ability to

perform work with the limitations described in the [RFC.]" (*Id.* at PageID # 102).

### iv.        *Williams's Arguments*

Williams argues that her difficulties with standing and walking, combined with her need for a cane, limit her to performing sedentary work, which requires a finding that she is disabled. (ECF Doc. No. 16, PageID # 730). Williams argues that the ALJ "did not directly acknowledge that [she] had severe osteoarthrosis of both knees[,] which resulted in surgeries, or that examinations show decreased ranges of motion, antalgic gait, and tenderness to the knees." (*Id.*). She also argues that she consistently reported problems with standing, walking, and negotiating stairs, and that her use of a cane – even if she does not use it every day – limits her ability to work. (*Id.*).[2]

In support of her argument, Williams cites to medical records indicating that she has continuing bilateral knee pain, that she had two knee surgeries, and that examinations of the knees has shown decreased ranges of motion, tenderness, an antalgic gait, a positive patella grind test, a varus deformity, and effusion of the knees. (*Id.* at PageID # 729). She also cites to her own statements contained in the medical records, wherein she reported that her knee pain is worse with activity, and that it limits her from sitting for prolonged periods, standing, walking, and overall weight bearing activities. (*Id.*). Williams acknowledges that her obesity affects her ability to engage in weight bearing activities, that it limits her ability to stand and walk, and that it exacerbates her knee pain. (*Id.*). Williams also acknowledges that her knee surgeries provided

---

[2] In a perfunctory manner, Williams asserts that "the ALJ erred in the persuasiveness that she assigned to the opinion of Dr. Chao in which she would miss work three times a month. The medical records support this limitation of Dr. Chao." (ECF Doc. No. 16, PageID # 728). Because Williams did not specifically develop an argument in this regard, it is deemed forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (alteration in original) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n,* 59 F.3d 284, 29-94 (1st Cir.1995) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

some relief, but asserts that she developed neuropathic right knee pain, and is hypersensitive to touch. (*Id.* at PageID # 730). Williams concludes that, because she is limited to sedentary work, a finding of disabled is required or, alternatively, remand is necessary for the ALJ to determine an RFC that is supported by substantial evidence. (*Id.* at PageID # 731).

### v.      Analysis

Williams's arguments lack merit. The ALJ considered Williams's testimony, detailed Williams's history of bilateral knee osteoarthritis (including her post-surgery progress), and cited medical records from Drs. Chao, Victoroff, and Bechtel, among others, as well as the conclusions of the state agency medical consultants. (*Id.* at PageID # 96-101). The ALJ explained why she found Williams's statements not entirely consistent with the record, and explained why she found the state agency medical consultants' opinions persuasive or not persuasive. The ALJ also discussed Williams's inconsistent use of a  cane (including the fact that Williams reported in September 2019 that she was not using any assistive devices), and the fact that Williams babysat her grandson three times per week for approximately six to eight hours at a time. (*Id.* at PageID # 98-99).

Having reviewed the ALJ's decision, the record (including the medical records summarized above, cited by the parties, and relied upon by the ALJ), and the arguments presented, I conclude that the ALJ's determination that Williams had the RFC to perform light work is supported by substantial evidence.

### 2.   Whether the ALJ's Decision that Williams's Major Depressive Disorder is a Non-Severe Impairment is Supported by Substantial Evidence

Next, Williams argues that the ALJ erred by determining that her major depressive disorder is not a severe impairment. (ECF Doc. No. 16, PageID # 731). For the following reasons, I conclude that Williams's argument lacks merit.

i.        *Severe Impairments: 20 C.F.R. §§ 404.1520(c) and  416.920(c)*

At Step Two of the sequential evaluation process, an ALJ must determine with a claimant's

medically determinable impairment is a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii)

and 416.920(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's]

physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c).

"Step two has been described as a '*de minimus* hurdle'; that is, 'an impairment can be considered

not severe only if it is a slight abnormality that minimally affects work ability regardless of age,

education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007)

(quoting *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988)).

"If a claimant has a medically determinable mental impairment, an ALJ 'must then rate the

degree of functional limitation resulting from the impairment(s)" with respect to "four broad

functional areas.'" *Chidsey v. Kijakazi*, No. 1:20-CV-01858, 2022 WL 4599195, at *6 (N.D. Ohio

Sept. 30, 2022) (quoting 20 C.F.R. §§ 404.1520a(b)(2), (c)(3)); 20 C.F.R. § 416.920a. "The four

broad functional areas are also commonly referred to as the 'paragraph B' criteria." *Chidsey* at *6.

ii.        *The ALJ's Analysis*

Regarding Williams's depressive disorder, the ALJ determined that it "does not cause more

than minimal limitation in the claimant's ability to perform basic mental work activities and is

therefore nonsevere." (*Id.* at PageID # 92). The ALJ explained her reasoning as follows:

> The evidence supports that the claimant's depression remained well controlled with
> conservative treatment. For example, treatment notes from November 27, 2018,
> indicate that she treated with venlafaxine and Trazodone to manage her assessed
> depression. However, no abnormal clinical findings were noted (2F/3-8).
> Additionally, the record does not reflect complaints of psychological sign or
> symptoms, or that she received treatment from a mental health provider as of the
> alleged onset date.
>
> The claimant underwent a psychological consultative examination with Paul Josell,
> PsyD on August 29, 2018. She described a history of a sad mood and periods of
> lower mood that led to suicide attempts. At the time of the evaluation, she described
> sadness with days of increased agitation and irritability, but noted more stability in

her mood overall. She presented as appropriately groomed as well as generally pleasant and cooperative upon examination. While mildly tearful at one point, she otherwise did not exhibit acute signs of depression or anxiety. Her thought processes were generally organized and goal oriented, and she described her mood as "ok" with medication over the prior several months. The claimant's affect was full, appropriate to thoughts, and nonlabile. She recalled six digits forward and three in reverse, suggesting impairments with attention, concentration, and immediate auditory recall. She put forth little effort in completing serial seven calculations, and made some errors with serial three subtractions. She recalled two of three items after a brief delay, and she demonstrated variable abilities with abstract thinking. However, she was assessed as having average intellectual abilities. Dr. Josell assessed her with persistent depressive disorder, with intermittent major depressive episodes (1F).

Based on the evaluation, Dr. Josell provided the following functional assessment. The claimant's ability to relate to others appeared impaired to the extent that she stated she was disinterested in interacting much with others. Her ability to understand and follow directions did not appear impaired at that time. The claimant's mental ability to maintain attention, concentration, and persistence and pace to perform routine tasks appeared generally adequate. Finally, her mental ability to withstand the stress and pressures associated with day-to-day work activity did not appeared impaired from a cognitive or emotional perspective at that time (1F).

The record indicates that the claimant did not seek specialized mental health treatment until April 2019. Specifically, she underwent a psychological evaluation with Deborah Klecha, LPCC on April 13, 2019. She reported that she frequently felt overwhelmed and indicated that she wanted to be able to function around people. The claimant's mood appeared depressed with a congruent affect. However, her thought process and associations were within normal limits, and her insight and judgment appeared good upon examination. Her recent and remote memory were intact, her attention was within normal limits. She was assessed with major depressive disorder, recurrent, moderate (12F/2-28). During her June 15, 2019 therapy session, the claimant reported continued struggles with motivation to get out of bed and do anything. No clinical findings were included in the treatment notes (16F/2-191). On August 3, 2019, the claimant worked on feelings of grief and guilt related to her mother's death. No objective findings were recorded (16F/29-36). However, clinical findings from evaluations on March 26, 2019, June 19, 2019, and September 4, 2019 reflect a normal/pleasant mood and affect (14F/5, 17F/2, 19F/2).

(*Id.* at PageID # 92-93).

The ALJ then indicated that, in making this finding, she "considered the [four] broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1)[,] . . .

known as the 'paragraph B' criteria." (*Id.* at PageID # 93). The ALJ explained:

> In understanding, remembering, or applying information, the claimant has no limitations. The claimant did not allege any particular issues in this area. However, the claimant also stated that she could perform household chores, take medications, and read. In addition, the record contains findings of intact recent and remote memory (5E, 12F/2-28).
>
> In interacting with others, the claimant has mild limitations. Here, the claimant alleged that she has difficulty getting along with others. However, according to her statements, the claimant is also able to spend time with friends and family and attend church. Finally, the medical evidence shows that the claimant was described as pleasant and cooperative (5E, 1F, 14F/5, 17F/2, 19F/2).
>
> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has mild limitations. The claimant contended that she has limitations in completing tasks. On the other hand, the claimant said that she is also able to drive, prepare meals, and watch television. Additionally, the record fails to show an inability to complete testing that assesses concentration and attention (5E, 1F).
>
> Finally, the claimant has no limitations in her ability to adapt or manage herself. The claimant did not allege any symptoms or limitations that relate to this criterion. Furthermore, the claimant also stated that she is able to care for her grandson for serval hours per week. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, normal mood and affect, and no problems with temper control (5E, 1F, 14F/5, 17F/2, 19F/2).
>
> Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

(*Id.* at PageID # 94).

The ALJ then explained that "the limitations identified in the 'paragraph B' criteria are not a [RFC] assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." (*Id.*). The ALJ then set forth her RFC assessment, which reflects the degree of limitation the ALJ found in the "Paragraph B" mental function analysis. The ALJ explained:

The State agency psychological consultants, Kristen Haskins, PsyD and Aracelis Rivera, PsyD, assessed that the claimant had no severe mental impairment and therefore provided no related functional limitations (1A, 2A, 5A, 6A). While they did not examine the claimant, this finding is consistent with her limited specialized mental health treatment, pleasant and cooperative presentation, intact recent and remote memory, findings of a normal mood and affect, and organized and goal-oriented thought process (1F, 12F/2-28, 14F/5, 17F/2, 19F/2). Similarly, it is consistent with her reported abilities to cook, clean, attend church, spend time with family, read, watch television, and care for her grandson (5E). For these reasons, the assessment of Dr. Josell is persuasive as it is consistent with the nonsevere finding. Notably, the assessment that her ability to relate to others was impaired was due to her lack of interest, but otherwise she reported she interacted with others, cared for her grandson, attended church and was pleasant and cooperative, which supports no more than mild limitations (1F).

(*Id.* at PageID # 94-95).

### iii.  *Williams's Arguments*

As previously noted, Williams argues that the ALJ erred by determining that her major depressive disorder is not a severe impairment. (ECF Doc. No. 16, PageID # 731). In support of her argument, Williams cites Dr. Josell's report and opinion, wherein Dr. Josell noted that Williams appeared sad, had difficulty with some of the number-related tasks, and had an impaired ability to relate to others to the extent Williams reported that she was not interested in interacting with others. (*Id.* at PageID # 732-33). Williams argues that the ALJ's reliance on Dr. Haskins's and Dr. Rivera's opinions was misplaced because those opinions were inconsistent with Dr. Josell's report and opinion. (*Id.* at PageID # 732).

Williams also argues that her records from Ms. Klecha, which were filed after the state agency medical consultants reviewed the records, undermine the ALJ's decision. (*Id.* at PageID # 733). Williams cites Ms. Klecha's records that indicate that she: (1) was diagnosed with major depressive disorder, recurrent, moderate; (2) reported that she did not want to interact with other people and was self-isolating; (3) reported that her ability to work, get along with other people, and take care of things at home was "extremely difficult"; (4) had a goal of being able to be around other people; (5) had a depressed mood, anxiety attacks, and an increased appetite; (6) was

worrisome and had feelings of hopelessness; (7) was unable to experience pleasure; and (8) had difficulty with her motivation to get out of bed. (*Id.* at PageID # 733).

Williams also cites her own statements contained in the medical records, wherein she reported experiencing: (1) days with increased agitation and irritability; (2) variable energy; (3) trouble sleeping; (4) disinterest with being around most people; and (5) terrible self-esteem. (*Id.* at PageID # 732). Williams concludes that she "would at least have some mental characteristics [that] would [a]ffect her RFC[,]" and that a "[r]emand is warranted in order for the ALJ to determine that [her] major depressive disorder is a severe impairment[,] and to determine what limitations resulted from that impairment." (*Id.* at PageID # 733-34).

### iv.      Analysis

The ALJ's determination that Williams's major depressive disorder is not a severe impairment is supported by substantial evidence. The ALJ considered the relevant records, including those cited by Williams, and supported her decision with citations to the relevant records. For example, the ALJ cited numerous medical records (including many of those summarized above) that indicate that Williams consistently presented with a normal mood and affect, and had an organized, goal-oriented thought process. The ALJ also cited Ms. Williams's own statements and testimony, indicating that Williams spent time with her family, read, watched television, and cared for her grandson several days a week. The undersigned notes that Williams also testified that she attends church, plays crossword puzzles, and participates in a book club. (ECF Doc. No. 13, PageID # 130-32). The ALJ also discussed Williams's records from Ms. Klecha, and explained why she found the state agency medical consultants' opinions persuasive or not persuasive.

Simply put, the record – when read as a whole – does not support Williams's argument that the ALJ's decision lacks substantial support. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528,

535 (6th Cir. 2001) ("Judicial review of the Secretary's findings must be based on the record as a whole."). Having reviewed the ALJ's decision, the record (including the medical records summarized above, cited by the parties, and/or relied upon by the ALJ), and the arguments presented, the undersigned concludes that the ALJ's determination that Williams's depressive disorder is not a severe impairment is supported by substantial evidence.

## VI.      RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.

Dated: 12/14/2022                                    _s/Jennifer Dowdell Armstrong_
                                                     Jennifer Dowdell Armstrong
                                                     U.S. Magistrate Judge

## VII.     NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

_Id._ (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of

the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).